UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Lower Town Project, LLC,

       Plaintiff,

v.

Lawyers Title Insurance Co.,

       Defendant/Third-Party Plaintiff,

v.

Scott Chappelle, Strathmore Development
Company Michigan, LLC, Lower Town
Development Group, LLC, Clark
Construction Co., and Terra Management
Co.,

       Third-Party Defendants.

_____/

Case No. 10-11615

Honorable Nancy G. Edmunds

**ORDER AND OPINION DENYING LOWER TOWN PROJECT'S MOTION FOR
SUMMARY JUDGMENT [33]; DENYING LAWYERS TITLE'S MOTION FOR
SUMMARY JUDGMENT [35]; DENYING CHAPPELLE, STRATHMORE, LOWER
TOWN DEVELOPMENT, AND TERRA'S MOTION FOR SUMMARY JUDGMENT [34];
AND DENYING CLARK'S MOTION FOR SUMMARY JUDGMENT [31]**

      This case arises out of a failed commercial real estate development project. Plaintiff

Lower Town Project has filed suit against Defendant Lawyers Title Insurance Company,

seeking insurance coverage (the reimbursement of a settlement amount) from Lawyers

Title pursuant to an insurance policy (the "Policy") the two parties executed. The settlement

resolved a state court controversy between Lower Town Project and several

companies–Clark Construction Company, Conestoga-Rovers and Associates, and H&M

Demolition Company–that had filed liens on Lower Town Project's commercial real estate

development project, Broadway Village.  Those companies filed suit to foreclose on the liens.

Both during the settlement negotiations with the companies and now, Lower Town Project alleges that those liens on Broadway Village were defects in the title, for which the Policy provides coverage.  Lawyers Title alleges that the Policy does not provide coverage for the settlement due to the liens.  Lawyers Title advances other arguments why the Policy does not provide coverage as well.

In addition to the breach of the Policy claim, Lawyers Title has filed a third party complaint for misrepresentation and indemnification against several of the players involved in the controversy: Scott Chappelle, Lower Town Development, Terra Management Company, and Clark.  The Court will discuss their roles below.

Before the Court:

- Lower Town Project's motion for summary judgment as to liability against Lawyers Title.  (Dkt. 33.)

- Lawyers Title's motion for summary judgment on Lower Town Project's claims and Lawyers Title's motion for summary judgment on its claims against Chappelle, Strathmore, Lower Town Development, and Terra.  (Dkt. 35.)

- Chappelle, Strathmore, Lower Town Development, and Terra's motion for summary judgment on Lawyers Title's indemnity and misrepresentation claims against them.  (Dkt. 34.)

- Clark's motion for summary judgment on Lawyers Title's indemnity and misrepresentation claims. (Dkt. 31.)

2

The Court heard the parties on June 29, 2011.[1]  For the reasons stated below, the Court DENIES Lower Town Project's motion for summary judgment as to liability against Lawyers Title; DENIES Lawyers Title's motion for summary judgment against Lower Town Project; DENIES Lawyers Title's motion for summary judgment against Chappelle, Strathmore, Lower Town Development, and Terra; DENIES Chappelle, Strathmore, Lower Town Development, and Terra's motion for summary judgment on Lawyers Title's misrepresentation claims; DENIES Clark's motion for summary judgment on Lawyers Title's misrepresentation claims; and DENIES AS PREMATURE Lawyers Title's indemnification claims against Chappelle, Strathmore, Lower Town Development, Terra, and Clark.

## I.   Facts

### A. Background parties

Lower Town Development was formed in June, 2002, to own and redevelop a real estate project.  The real estate project, Broadway Village, was a 774,000 square-foot urban mixed-use development.[2]  Broadway Village's plans included space for retail, restaurants, offices, multi-family housing, and parking.  (Def.'s Mot. for Summ. J., Ex. E, Lower Town Project Operating Agreement.)

---

[1]At the hearing, and in the briefs, the parties discussed a possible misnumbering of the policy at issue in this case.  The parties dispute the misnumbering's relevance and have not fully addressed the issue.  Lawyers Title claims only one policy exists; the other parties disagree. (See also Chappelle's Mot. for Summ. J. at 12-13; Lawyers Title's Resp. to Chappelle's Mot. for Summ. J. at 12-13.)

[2]The project was also known as "Lower Town."  The parties refer to the project also as Lower Town.  Because several parties contain the "Lower Town" name, the Court will refer to the project as "Broadway Village."

3

Lower Town Development is one of two members that formed  Lower Town, LLC. (Def.'s Mot. for Summ. J., Ex. F, Def's. First Set of Interrog., Ans. No. 2.)  On October 18, 2007, Lower Town LLC formed Lower Town Project.  (Def.'s Mot. for Summ. J., Ex. E, Lower Town Project Operating Agreement.)  Lower Town, LLC is the sole member of Lower Town Project.  (Def.'s Mot. for Summ. J., Ex. E, Lower Town Project Operating Agreement.)

On November 14, 2007, Lower Town Development transferred Broadway Village to Lower Town Project by warranty deed.  (Def.'s Mot. for Summ. J., Ex. A, Warranty Deed.)

### B. Scott Chappelle's role

The third-party complaint alleges that Chappelle, Lower Town Development, Strathmore, Terra, and Lower Town Project were all Chappelle-controlled entities.

Chappelle was the president of Strathmore, and before that, Terra.  (Lawyers Title's Resp. to Clark, Ex. L, Chappelle Interrog., Answer 3.)  He also owned/managed Lower Town Development.

Strathmore was the manager of Lower Town Development.  (Def.'s Mot. for Summ. J., Ex. E, Lower Town Project Operating Agreement.)  Before Strathmore, Terra was the manager of Lower Town Development.   (Def.'s Mot. for Summ. J., Ex. G, Terra Management Agreement.)

Chappelle, in his various roles, signed contracts and assignments on behalf of Terra, Lower Town Project, Lower Town, LLC, Lower Town Development, and Strathmore. (Lawyers Title's Resp. to Clark, Ex. N, Terra-Clark Assignment.)

Lower Town Project states that Chappelle, through his various entities, was primarily involved at Broadway Village on behalf of Lower Town Project.  (Lawyers Title's Resp. to

4

Clark, Ex. F, Lower Town Project Interrog., Answer 3.)  But Lower Town Project states that

it never employed Chappelle.  (*Id.*)  Chappelle, on behalf of Lower Town Development,

managed both Lower Town, LLC, and Broadway Village until May 7, 2009.  Lower Town

Project states that Chappelle had "broad oversight responsibilities" over Broadway Village

as Strathmore's president.  (*Id.*, Answer 6.)

### C. Management of Lower Town Project

Strathmore also entered into a property management and leasing agreement with

Lower Town, LLC.  (Def.'s Mot. for Summ. J., Ex. H, Strathmore Property Agreement.)  The

agreement provided that Strathmore would manage and operate Broadway Village.[3]  (*Id.*)

---

[3]The agreement included a "Supervision of Design and Construction" provision:
"[Strathmore] will supervise and oversee ordinary repairs, maintenance, replacements,
substitutions, improvements, additions and alternations ("Ordinary Work").  [Strathmore]
will supervise and oversee capital projects, replacements, substitutions, improvements,
additions and alterations, including, without limitation Space Planning, Design
Documentation and Tenant Improvements ("Capital Projects"). . . . [Strathmore] shall
perform Design and Construction Management Services subject to Owner's written
approval and guidelines. . . . [Strathmore] shall ensure that all appropriate insurance has
been obtained and is in effect and shall oversee the administration of the applicable
construction contracts.    [Strathmore's]  responsibilities  in  performing  the  Design  and
Construction Management services shall include, without limitation: development plans,
selecting materials, analyzing plans, working with outside consultants, writing specifications
and suggesting revisions thereof; suggesting contractors and supervising constructions;
coordinating, when appropriate, with [Lower Town, LLC], tenants, architects, engineers,
contractors and other consultants to prepare and finalize construction plans; identifying and
contracting  on  behalf  of  [Lower  Town,  LLC]  appropriate  professional  services  when
required; negotiating all contracts; monitoring the construction schedule and the quality of
workmanship . . . administering and coordinating job site construction meetings as
necessary to ensure the timely flow of information between tenants, space planners and
contractors; coordinating labor and material suppliers; managing the change order process
. . . obtaining and reviewing all necessary lien waivers and releases; reviewing all payment
requests  pursuant  to  the  contract  documents  .  .  .  obtaining  from  contractors,
subcontractors, material suppliers or other consultants all reasonably available guarantees,
instructions, equipment manuals, warranties and all other pertinent documents relating to
Work; and, at Owner's option, any or all other duties."  (Def.'s Mot. for Summ. J., Ex. H,
Strathmore Property Agreement at 14-15.)

### D. Scott Chappelle's affidavit

As part of the closing that transferred Broadway Village to Lower Town Project, on November 14, 2007, Scott Chappelle, as Strathmore's President and Lower Town Development's manager, executed an affidavit. (Def.'s Mot. for Summ. J., Ex. B, Affidavit.) In this affidavit, Chappelle made a declaration that is central to this dispute. Chappelle declared:

> That no work has been performed or material delivered to [Broadway Village] for a period of (120) days prior to the date of this affidavit, and if any work has been performed or materials delivered during said 120 day period, proper sworn statements and waiver of liens showing payment or release of lien rights have been obtained and submitted to Transnation Title Insurance Company for its approval.

(*Id.*)

### E. Transnation issues the insurance policy

On December 19, 2007, Transnation issued the Policy that insured Broadway Village against certain losses or defects in its title.[4] (Def.'s Mot. for Summ. J., Ex. D, Insurance Policy.) The Court will discuss more fully the Policy and its relevant provisions below.

### F. Clark, Conestoga, and H&M file claims of liens on Broadway Village

After Broadway Village's transfer to Lower Town Project, a dispute arose involving several companies that had provided labor and services to Broadway Village before the Policy was issued–Conestoga, Clark, and H&M.[5] Conestoga was an environmental firm that worked on Broadway Village. Clark was the general contractor for Broadway Village.

---

[4]Lawyers Title is the successor to Transnation. The Court therefore references the proper entity as the timing of the facts sees fit.

[5]H&M is not a party to this dispute. Its lien amount was included in Clark's lien.

6

On June 4, 2008, Conestoga filed a claim of lien on Broadway Village for $1,319,886.76. (Def.'s Mot. for Summ. J., Ex. R, Conestoga Claim of Lien.)  The claim shows that Conestoga first provided labor on April 7, 2004, and last did so on April 11, 2008. (*Id.*)

On October 2, 2008, Clark filed a claim of lien on Broadway Village for $1,520,719.95. (Def.'s Mot. for Summ. J., Ex. Q, Clark Claim of Lien.)  The lien shows that Clark first provided labor for Broadway Village on April 15, 2004, and last provided labor on July 11, 2008. (*Id.*)

On June 20, 2008, H&M filed a claim of lien against Broadway Village for $49,013.50. (Def.'s Mot. for Summ. J., Ex. S, H&M Claim of Lien.)

### G. The parties' prior litigation, Lower Town Project's request for Lawyers Title's involvement, and Lawyers Title's investigation

On October 31, 2008, Conestoga filed a complaint to foreclose its construction lien against Broadway Village in Michigan state court.  (Compl., Ex. C, Lower Town Project letter to Lawyers Title.)  Clark and H&M followed suit.  (*Id.*)  Lower Town Project states that the total liens' amount was almost $3,000,000.00.  (*Id.*)

Lawyers Title states that Strathmore, Lower Town Development, and Chappelle, retained counsel, appeared in that litigation, and actively defended their positions.  (Def.'s Mot. for Summ. J., at 12.)

On July 30, 2009, nine months after the complaint, Lower Town Project submitted notice of the litigation to Lawyers Title.  (Compl., Ex. C, Lower Town Project's letter to Lawyers Title.)  The letter shows that, after discovery in the state court suit, Lower Town Project learned that the construction liens involved work done prior to the Policy.  (*Id.*)

7

Lower Town Project then asked Lawyers Title "to honor its commitments under the [Policy] and to indemnify and defend Lower Town [Project]." (*Id.*)

On September 15, 2009, Lower Town Project notified Lawyers Title that it had participated in a facilitative mediation with Conestoga, Clark, and H&M. (Pl.'s Mot. for Summ. J., Ex. E, Lower Town Project-Lawyers Title Correspondence.) Lower Town Project notified Lawyers Title of the settlement offer and invited Lawyers Title to participate in the negotiations. (*Id.*) On October 26, 2009, Lower Town Project notified Lawyers Title about the case evaluation award in the litigation. (*Id.*) In the October 26 letter, Lower Town Project requested guidance from Lawyers Title. (*Id.*) The letter shows that Lower Town Project was told that Lawyers Title could take up to six months to decide whether it would assume Lower Town Project's defense costs. (*Id.*) The letter also shows Lower Town Project's predicament: "[Lawyers Title's] utter inaction in this matter has put Lower Town [Project] in an impossible position: if it settles, it risks coverage arguments from [Lawyers Title]; if it does not settle, it risks losing the property in its entirety." Lower Town Project requested a response no later than November 2, 2009. (*Id.*)

On November 10, 2009, Lower Town Project and Lawyers Title corresponded. Lawyers Title wrote that it was still "continuing [its] coverage analysis." (*Id.*) When Lower Town Project asked if Lawyers Title objected to the $1,700,000.00 settlement, and stated that it was meeting with Conestoga, Clark, and H&M, Lawyers Title stated that it "anticipate[d] having [its] coverage analysis shortly," but that it "[could not] advise [Lower Town Project] as to Lawyers [Title's] position." (*Id.*) Lawyers Title added that it was "not waiving any defenses available under the [P]olicy." (*Id.*)

8

At the end of November, 2009, Lower Town Project settled the litigation for $1,600,000.00; in the settlement, Lower Town Project agreed to release all the claims. (Def.'s Mot. for Summ. J., Ex. T, Settlement Agreement.)  Chappelle signed the settlement as president of Strathmore, Terra, and Lower Town Development.  (*Id.*)  An executive committee member signed on Lower Town Project's behalf.  (*Id.*)

Lower Town Project states that Lawyers Title formally denied coverage on April 21, 2010, in its answer to Lower Town Project's complaint in this case.  (Pl.'s Mot. for Summ. J. at 6.)

### H.  Lower Town Project's complaint

On April 21, 2010, Lower Town Project filed a two count complaint against Lawyers Title.  Count I is a breach of insurance contract claim.  In Count II, Lower Town Project alleges that Lawyers Title violated Michigan Complied Law 500.2006, by failing to timely pay the insurance contract's benefits.

In its complaint, Lower Town Project states that, as soon at it learned that the affidavit was false, and that the liens were related to labor and material furnished prior to Broadway Village's sale to Lower Town Project, Lower Town Project notified Lawyers Title and asked it to honor the policies.  (Compl. ¶ 11; Ex. C to Compl.)  Lower Town Project states that Lawyers Title requested information from it to investigate the claim and that Lower Town Project complied with all the requests. (Compl. ¶ 12.)  Lower Town Project also requested that Lawyers Title defend Lower Town Project in the state court litigation or agree to pay the judgment obtained by the lien claimants and/or authorize a settlement.  (Compl. ¶ 13.)  Lower Town Project states that Lawyers Title did not comply with any of its requests. (Compl. ¶ 14.)

9

**I. Lawyers Title's third-party complaint**

On May 28, 2010, Lawyers Title filed a third-party complaint.  (Dkt. 6.)  Lawyers Title filed its complaint against Chappelle, Strathmore, Lower Town Development, Clark, and Terra.

Lawyers Title states that, around November 14, 2007, Transnation Title conducted a closing for an equity transaction between Lower Town Development and Lower Town Project for Broadway Village.  (Third Party Compl. ¶ 9.)   Lawyers Title states that, at the closing, Chappelle, Strathmore's president and manager of Lower Town Development, executed an affidavit that no companies had performed any work at Broadway Village for 120 days prior to the affidavit or that if work had been performed, those entities that performed the work executed waivers of liens.   (*Id.* ¶ 10; Ex. A.)

Lawyers Title next alleges that, right before the closing, on October 31, 2007, Clark and Terra executed an assignment and agreement relating to Broadway Village, in which Clark and Terra represented and warranted that there was no outstanding default under its contract, and that the contract was not subject to any claim, set-off, lien, or encumbrance.  (*Id.* ¶ 11; Ex. B.)  The assignment assigned Clark's contract with Terra to Lower Town Project.  (*Id.* ¶ 12.)  Chappelle signed the assignment for Terra and Lower Town Project.  (*Id.*)

Lawyers Title states that it relied upon the representation and thereafter issued the Policy to Lower Town Project for Broadway Village, dated December 19, 2007.  (*Id.* ¶ 13.)

Lawyers Title's theory is that, if the Court finds that Lawyers Title is liable to Lower Town Project, then Lawyers Title is entitled to indemnification from the third-party defendants.  Lawyers Title asserts seven claims against the third-party defendants:

- Count I: indemnity against Chappelle, Strathmore, and Lower Town Development;

- Count II:  indemnity against Clark;

- Count III:  indemnity against Terra;

- Count IV:  misrepresentation against Lower Town Development, Strathmore, and Chappelle;

- Count V:  misrepresentation against Clark; and

- Count VI:  misrepresentation against Terra.

## II.   Summary judgment standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Revised Rule 56 expressly provides that:

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The revised Rule also provides the consequences of failing to properly support or address a fact:

11

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or

(4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).   "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

## III.   Analysis

The Court's first task in this set of motions is to determine whether Lower Town Project is entitled to coverage under the Policy for the alleged defects on Broadway Village's title.  If the Court finds that Lower Town Project is not entitled to coverage, then Lawyers Title's third party complaint is rendered moot and the Court need not address the remaining claims.

12

But that is not the case here. As the Court will discuss below, although the Policy is clear, there is a genuine issue of material fact whether a Policy exclusion applies so that Lawyers Title does not have to provide coverage. Because there is a genuine issue of material fact, the Court will address the remaining motions for summary judgment relating to Lawyers Title's third-party complaint. As to Lawyers Title's third party complaint, the Court finds that it has brought forth sufficient evidence on its misrepresentation claims against the third-party defendants and will allow the claims to proceed if Lawyers Title is found to be liable to Lower Town Project. And as to the indemnification claims, the Court finds that these motions depend upon the resolution of the Policy controversy. The Court will therefore deny summary judgment on those claims as well.

## A.   Lower Town Project–Lawyers Title motions for summary judgment

### 1.  The Policy is clear, but there is a genuine issue of material fact whether a Policy exclusion applies

#### a.  Michigan contract construction principles

The rules of construction for insurance contracts are the same as those for any other written contract. *Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 942 (6th Cir. 1993). The court must first determine whether the contract language at issue is ambiguous. That question is one of law for the court. *Mayer v. Auto-Owners Ins. Co.*, 338 N.W.2d 407, 409 (Mich. Ct. App. 1983). Construction of a contract, whether it is ambiguous or unambiguous, likewise presents a question of law for the court. *Fragner v. Am. Cmty. Mut. Ins. Co.*, 502 N.W.2d 350, 352 (Mich. Ct. App. 1993). The function of the court is to determine and give

13

effect to the parties' intent as discerned from the policy's language, looking at the policy as a whole. *Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 434 (Mich. 1992).

A contract that admits of but one interpretation is unambiguous. *Fragner*, 502 N.W.2d at 352. In contrast, a contract provision is ambiguous if it is capable of two or more constructions, both of which are reasonable. *Petovello v. Murray*, 362 N.W.2d 857, 858 (Mich. Ct. App. 1984).

If a contract is clear and unambiguous, the court must enforce the contract as written, according to its plain meaning, *Clevenger v. Allstate Ins. Co.*, 505 N.W.2d 553, 557 (Mich. 1993), without looking to extrinsic evidence. *Upjohn Co. v. New Hampshire Ins. Co.*, 476 N.W.2d 392, 396 n. 6 (Mich. 1991). It is improper for the court to ignore the plain meaning of the policy's language in favor of a technical or strained construction. *Arco Indus. Corp. v. Travelers Ins. Co.*, 730 F. Supp. 59, 66 (W.D. Mich. 1989).

If the contract is ambiguous, the court must determine the intent of the parties. To do so, the court may look to extrinsic evidence such as custom and usage. *Michigan Millers Mut. Ins. Co v. Bronson Plating Co.*, 496 N.W.2d 373, 379 (Mich. Ct. App. 1992), *aff'd*, 519 N.W.2d 864 (Mich. 1994).

In addition, certain rules of construction apply. Ambiguous terms in an insurance policy are construed in favor of the insured. *Arco Indus. Corp. v. Am. Motorists Ins.*, 531 N.W.2d 168, 172 (Mich. 1995). Accord *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 786-87 (Mich. 2003) (holding that "[t]he rule of reasonable expectations clearly has no application to unambiguous contracts. That is, one's alleged 'reasonable expectations' cannot supersede the clear language of a contract. . . . [Moreover], if a contract is

14

ambiguous and the parties' intent cannot be discerned from extrinsic evidence, the contract should be interpreted against the insurer.  In other words, when its application is limited to ambiguous contracts, the rule of reasonable expectations is just a surrogate for the rule of construing against the drafter.").

It is the insurer's responsibility to clearly express limits on coverage.  *Auto Club Ins. Ass'n v. DeLaGarza*, 444 N.W.2d 803, 806 (Mich. 1989).   Thus, insurance exclusion clauses are construed strictly and narrowly.  *Auto-Owners v. Churchman*, 489 N.W.2d at 435; *Farm Bureau Mut. Ins. Co. v. Stark*, 468 N.W.2d 498, 501 (Mich. 1991).

> **b.  The Transnation/Lawyers Title insurance policy issued to Lower Town Project for Broadway Village**

The Policy, issued December 19, 2007, contains a covered risks section. That section states:

> SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS . . . [Transnation] insures, as of Date of Policy and, to the extent stated in Covered Risks 9 and 10, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:
>
> 2. Any defect in or lien or encumbrance on the Title.

(Compl., Ex. A, Transnation Policy.)   The exclusions are at issue in this case.   The exclusions:

> The following matters are expressly excluded from the coverage of this policy, and [Transnation] will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of: . . .

   3.  Defects, liens, encumbrances, adverse claims, or other matters

   (a)    created, suffered, assumed, or agreed to by the Insured Claimant;

   (b)    not known to [Transnation], not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to [Transnation] by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy . . .

   (d)    attaching  or created subsequent to Date of Policy[.]

The Policy defines, "Knowledge" or "Known" as, "Actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title." (Compl., Ex. A, The Policy.)

> **c. The Policy covers the liens but there is a genuine issue of material fact whether an exclusion precludes coverage for Lower Town Project**

There are three Policy exclusions at issue.  The first exclusion relates to the date of the Policy.  Lawyers Title argues that the liens did not attach prior to the date of the policy. Lower Town Project disagrees.  The second two exclusions relate to whether Lower Town Project "created, suffered, assumed, or agreed to" or had actual knowledge of the liens at the time of Policy.

In addition to the Policy exclusions, both Lawyers Title and Lower Town Project argue that the other did not act timely under the Policy's terms.  And finally, Lawyers Title argues that the known loss doctrine and equitable estoppel should prevent Lower Town Project from recovering under the Policy.

16

### i. The Policy covers the liens

Lawyers Title first argues that the Policy does not cover the construction liens because the liens were not liens "as of the Date of Policy," as required by the Policy. (Def.'s Mot. for Summ. J. at 8.)   Lawyers Title maintains that Lower Town Project is not entitled to coverage because the Policy only insures against title defects that arise before the date of the Policy–here, December 19, 2007.   (Def.'s Mot. for Summ. J. at 18.) Lawyers Title relies upon *Pullum Window Corp. v. Randy M. Deprez Custom Builder, Inc.*, No. 294335, 2010 WL 5175404 (Mich.Ct.App. Dec. 21, 2010) to support its position that the liens are not defects in title as of the date of the Policy.  The Court does not find *Pullum* persuasive.  The liens are within the confines of the Policy.

In *Pullum*, Fidelity Bank attempted to recover under a title insurance policy from Chicago Title Insurance Company after it settled a lien issue with Pullum Window. *Pullum*, 2010 WL 51575404, at *1.  Chicago Title denied coverage after it found that Pullum Window first provided coverage and services post-policy and that the lien therefore was excluded from coverage.  *Id.*  The policy insured against loss for: "[l]ack of priority of the lien of the insured mortgage over any statutory lien for services, labor or material: (a) arising from an improvement or work related to the land which is contracted for or commenced prior to the Date of Policy[.]"  *Id.*  The date of the policy was December 6, 2005.  *Id.* at *3.  The court addressed whether the policy covered Pullum Window's construction lien on the covered property that was recorded on August 15, 2007, and noted that Pullum Window first provided labor or materials on May 31, 2007.  *Id.* at *2.  The court held that the liens were not covered.  *Id.* at *5.  The liens were not covered because the

17

insurance contract stated that Chicago Title would not provide coverage for liens after the date of the policy. *Id.* And these liens and the work done on the property started after the policy. *Id.*

The court rejected Fidelity Bank's argument that it could use the Construction Lien Act's relation back principle to escape the contract's unambiguous language. *Id.* (stating that "we decline to overlay the relation back principle of the Construction Lien Act on the parties' insurance contract"). (Pullum Window was attempting to use the relation back principle to show that a third-party had begun construction on the property before the date of the policy. But nothing in the record showed that Pullum Window had actually done that work. And in fact, Pullum Window's notice of lien explicitly stated that it first provided work after the Policy was issued.) Because the contract was clear and the liens fell explicitly within an exclusion, Fidelity Bank was not entitled to coverage.

Lawyers Title's reads *Pullum* too broadly. Here, the notices of liens state that Clark, Conestoga, and H&M first provided work before the date of the Policy–unlike the lien filed in *Pullum*. That case therefore is not helpful to Lawyers Title's cause.

Lower Town Project argues that, under Michigan law, the liens attached prior to the date of the Policy and that the Policy expressly includes coverage for such liens.

The Court agrees with Lower Town Project. The Policy excludes coverage for liens that attach or are created after the date of the policy. (Compl., Ex. A, the Policy, Exclusions from Coverage, 3(d).) Under Michigan law, a construction lien attaches on the date of the "first actual physical improvement." *Michigan Pipe & Valve-Lansing, Inc. v. Hebeler Enter.,*

18

*Inc.*, —N.W.2d—, 2011 WL 1004660, at *2 (Mich.Ct.App. Mar. 22, 2011) (citation omitted).

Michigan's Construction Lien Act defines "first actual improvement" as

> the actual physical change in, or alteration of, real property as a result of labor provided, pursuant to a contract, by a contractor, subcontractor, or laborer which is readily visible and of a kind that would alert a person upon reasonable inspection of the existence of an improvement. Actual physical improvement does not include that labor which is provided in preparation for that change or alteration, such as surveying, soil boring and testing, architectural or engineering planning, or the preparation of other plans or drawings of any kind of nature. Actual physical improvement does not include supplies delivered to or stored at the real property.

*Id.* (citing Mich. Comp. Law § 570.1103(1)).

Here, Clark first provided labor on April 15, 2004. (Def.'s Mot. for Summ. J., Ex. Q, Clark Claim of Lien.) Conestoga first provided labor on April 7, 2004. (Def.'s Mot. for Summ. J., Ex. R, Conestoga Claim of Lien.) These liens attached before the date of the Policy, December 19, 2007, and therefore fall within the Policy's terms.

### ii. There is a material issue of fact whether the remaining two exclusions apply

Since the Policy covers the liens, the Court moves on to the next inquiry–whether the liens fall within the remaining two Policy exclusions, thereby allowing Lawyers Title to escape coverage for the settlement amount. Both of these exclusions turn on whether Lower Town Project had actual knowledge of the liens. The Court will therefore present the exclusions and arguments under the two exclusions first and then address how the exclusions relate to the facts.

### a. The "created, suffered, assumed, or agreed to" the liens exclusion

19

The Policy excludes coverage for "[d]efects, liens, encumbrances, adverse claims, or other matters (a) created, suffered, assumed, or agreed to by the Insured Claimant." The Sixth Circuit has interpreted this very provision of this contract.

> The term "created" has generally been construed to require a conscious, deliberate and sometimes affirmative act intended to bring about the conflicting claim, in contrast to mere inadvertence of negligence. Similarly, the term "suffered" has been interpreted to mean consent with the intent that "what is done is to be done," and has been deemed synonymous with "permit," which implies the power to prohibit or prevent the claim from arising. Further, an insured does not assume an assessment against property "merely because he agreed to take the property 'subject to' any assessments." "Assume," under this definition requires knowledge of the specific title defect assumed. And "agreed to" carries connotations of "contracted," requiring full knowledge by the insured of the extent and amount of the claim against the insured's title. As with other terms, this definition implies some degree of intent.

*Am. Sav. and Loan Ass'n v. Lawyers Title Ins. Co.*, 793 F.2d 780, 784 (6th Cir. 1986) (all citations omitted). The Sixth Circuit has approved the following summary:

> The cases discussing the applicability of the "created or suffered" exclusion generally have stated that the insurer can escape liability only if it is established that the defect, lien or encumbrance resulted from some intentional misconduct or inequitable dealings by the insured or the insured either expressly or impliedly assumed or agreed to the defects or encumbrances in the course of purchasing the property involved. The courts have not permitted the insurer to avoid liability if the insured was innocent of any conduct causing the loss or was simply negligent in bringing about the loss.

*Id.* (citation omitted). The Sixth Circuit has held that "the application of exclusionary clauses such as the one at issue here often turns on notions of equity. To the extent that an insured has breached an obligation or would derive a windfall profit from recovery

20

against its insurer, courts are more inclined to find that the insured created, suffered, assumed or agreed to the defect, lien or encumbrance." *Id.* (citation omitted).

Lower Town Project first argues that it could not have "created, suffered, assumed, or agreed to" the lien because Terra assigned the Clark contract to Lower Town Project; and in that assignment, Terra and Clark warranted to Lower Town Project that there was no outstanding default under the contract. (Pl.'s Mot. for Summ. J. at 8.) Lower Town Project argues, therefore, that had Lawyers Title seen the assignment and the representations that the parties made, it would not have claimed that Lower Town Project "created, suffered, assumed, or agreed to" the lien. (*Id.* at 8-9.)

Lower Town Project then argues that "there is no basis from which Lawyers Title could argue that [Lower Town Project]" "created, suffered, assumed, or agreed to" the Conestoga lien. It argues this because Terra did not assign its contract with Conestoga to Lower Town Project. (Pl.'s Mot. for Summ. J. at 8.) Without the assignment, then, Lower Town Project could not have created, suffered, assumed or agreed to the Conestoga lien.

Lawyers Title argues that, if the liens are covered by the Policy, since the Conestoga, Clark, and H&M liens had attached well before the Policy, Lower Town Project "must be deemed" to have "suffered, assumed or agreed to" the liens. And the Court must therefore deem Lower Town Project to have had actual knowledge of the construction liens because Lower Town Project took title subject to the liens. (Def.'s Mot. for Summ. J. at 20.)

21

### b.   The actual knowledge exclusion

The Policy also excludes coverage for "[d]efects, liens, encumbrances, adverse claims, or other matters: not known to [Transnation], not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to [Transnation] by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy[.]"

The Policy defines, "Knowledge" or "Known" as, "Actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title." (Compl., Ex. A, The Policy.)

One court in this district has analyzed the "knowledge" or "known" provision of the Policy. *Lawyers Title Ins. Corp. v. First Fed. Savings & Bank*, 744 F.Supp. 778, 784 (E.D.Mich. 1990) (Cohn, J.). That court analyzed "what the parameters of such knowledge [were]" and what actions and knowledge constituted "actual knowledge." *Id.* The court determined that "[k]nowledge is what a person actually perceives[.]" The court used the following illustration:

> If A, while dealing with respect to a piece of property, deliberately and intentionally refrains from making inquiries concerning outstanding encumbrances or claims for the very purpose of avoiding any information, he is charged with notice of the encumbrances and claims which are actually outstanding; but he certainly does not acquire, and cannot possibly have knowledge of such prior charges or interests.

*Id.* (citation omitted).

### iii. There is a material issue of fact whether Lower Town Project had actual knowledge of the construction liens on the date of the Policy

What Lower Town Project knew–had actual knowledge of–about the construction liens is key in this case. But the knowledge issue is not straightforward. The strongest argument, and the reason why the Court will deny Lower Town Project and Lawyers Title's cross motions, is that Chappelle had actual knowledge of the liens at the time he signed the affidavit.[6] There are material issues of fact, though, whether Chappelle was an agent of Lower Town Project and what he knew about the construction liens. There are also issues of fact whether Chappelle's status with Strathmore, Lower Town Project, and Terra renders those entities agents as well. If Chappelle had actual knowledge of the liens and he was an agent of Lower Town Project, then Lower Town Project had actual knowledge and a policy exclusion would apply.

### a.    An agent's actual knowledge is the corporation's knowledge

"Under Michigan law, the knowledge of a corporate agent can be imputed to the entire corporation:"

> A corporation can only act through its employees and . . . the acts of its employees, within the scope of their employment, constitute the acts of the corporation. Likewise, knowledge acquired by employees within the scope of their employment is imputed to the corporation. In consequence, a corporation cannot plead innocence by asserting that the information obtained by several employees was not acquired by any one individual employee who then would have comprehended its full import. Rather, the

---

[6]This section applies to Strathmore, Lower Town Development, and Terra, as Chappelle is connected to and president/manager of those entities.

23

> corporation is considered to have acquired the collective knowledge of its employees and is held responsible for their failure to act accordingly.

*In re NM Holdings Co., LLC*, 622 F.3d 613, 620 (6th Cir. 2010) (citation omitted).

> When a person representing a corporation is doing a thing which is in connection with and pertinent to that part of the corporation business which he is employed, or authorized or selected to do, then that which is learned or done by that person pursuant thereto is in the knowledge of the corporation. The knowledge possessed by a corporation about a particular thing is the sum total of all the knowledge which its officers and agents ,who are authorized and charged with the doing of the particular thing[,] [acquire] while acting under and within the scope of their authority.

*New Prop., Inc. v. George D. Newpower, JR, Inc.*, 762 N.W.2d 178, 187-88 (Mich.Ct.App.

2009) (alterations in original).  This doctrine is known as the doctrine of imputed knowledge.

*Id.*  See also *Elsebaei v. JP Morgan Chase Bank, N.C.*, 289796, 2010 WL 1979434, at *

1(Mich.Ct.App. May 18, 2010) (stating, "a corporation [] could only have knowledge if one

of its agents or employees had knowledge.").

### b.    There is an issue of fact whether Chappelle was Lower Town Project's agent

There is a genuine issue of material fact about what Chappelle  knew and what of that

knowledge can be considered to be the knowledge of Lower Town Project.

Chappelle states that he does not remember whether any people or entities were

owed money for Broadway Village.  (Def.'s Mot. for Summ. J., Ex. K, Chappelle Dep. at

36.) Although he acknowledges that Clark became involved with Broadway Village at some

point, he states that he does not exactly remember when, but that Clark would have been

involved because Broadway Village needed a large contractor.  (*Id.* at 40.)

24

Chappelle states that he did not know what Clark did; rather, Chappelle says his job was to oversee the different aspects of Broadway Village's redevelopment–but not work closely with the architects, engineers, cost estimators, etc. (*Id.* at 41.) He states he would only have become aware of an issue if the issue needed his attention; which he states was not that often. (*Id.*) Chappelle states that he did not directly supervise Conestoga either. (*Id.* at 43.)

Chappelle states that he would not have signed the affidavit, had he thought that it was not true. (*Id.* at 48-49.)

Kenneth Lawless was deposed on Clark's behalf. Lawless was, and is, Clark's executive vice president. (Def.'s Mot. for Summ. J., Ex. L, Lawless Dep. at 6.) Lawless states that Chappelle called him to get involved in Broadway Village's preconstruction–which involved providing budget information in terms of what the total cost of the protect might be. (*Id.* at 8.) Lawless states that Clark dealt with Chappelle throughout Clark's involvement with Broadway Village. (*Id.* at 18, 20.)

On October 31, 2007, Clark and Terra assigned the Clark-Terra contract to Lower Town Project. (*Id.* at 22; Pl.'s Mot. for Summ. J., Ex. H, Assignment.) At the time of the assignment, Lawless states that Clark was owed money from Terra (*Id.* at 36.) As to the assignment, Lawless states that there was a substantial amount of work that it still had to do and for which it still needed to be paid. (*Id.* at 44.)

And Lawless adds that Clark called Chappelle on "a repeated basis to get paid and the answer generally was, ["]in a couple of weeks[."]" (*Id.* at 52.)

25

The Court finds that this conflicting testimony creates a material issue of fact. Lawless states that Chappelle was involved with Clark throughout Clark's work on Broadway Village–involvement that began before the date of the Policy and continued after. If Chappelle was involved as Lawless states, and was receiving calls from Lawless on a repeated basis, then the Court is inclined to find a question of fact exists whether Chappelle knew about the construction liens on Broadway Village.

### c. The Court is not persuaded by Lower Town Project's arguments

Lower Town Project argues that it did not have actual knowledge of the construction liens. Lower Town Project first relies on a statement made by Ms. Turney, Lawyers Title's witness, during her deposition when Lower Town Project asked about actual knowledge:

> I haven't seen the actual knowledge, but - - I don't personally know if there was actual knowledge. I haven't seen anything that there wasn't any actual knowledge, but certainly the knowledge of Strathmore [] and [] Terra [] as agents of Lower Town Project gave it that knowledge.

(Pl.'s Mot. for Summ. J. at 9-10, citing Turney Dep. at 29-30.) Lower Town Project argues that this statement is proof that no actual knowledge could have existed. The Court disagrees. As the Court has reviewed Michigan case-law above, an agent's knowledge is his company's knowledge. Ms. Turney's testimony is in line with that tenet.

Lower Town Project then points to an endorsement included in the Policy:

> Notwithstanding paragraphs 3(a) and 3(b) of the Exclusions from Coverage of the policy, [Transnation] assures [Lower Town Project] that, in the event of loss or damage insured against under this policy, [Transnation] will not deny liability under this policy to the insured on the ground that [Lower Town Project] had knowledge of any matter or matters solely by reason of notice

thereof imputed to [Lower Town Project] by operation of law (as opposed to actual knowledge) from Lower Town Development [].

(Compl.)

Lower Town Project contends that, under this provision, "even if imputed knowledge were good enough to demonstrate knowledge under paragraph 3(b), such knowledge cannot be imputed from the seller, [Lower Town Development]."  (Pl.'s Mot. for Summ. J. at 10.)  Here again, Lower Town Project misses the point.  The argument here is that Chappelle and his entities were agents of Lower Town Project.  The argument is about their actual knowledge, not Lower Town Project's notice from Lower Town Development.  The Court views a difference under the arguments–notice and actual knowledge are two different concepts under the law.  Here, knowledge is at issue and the Court finds that the above quoted endorsement does not apply.

Lower Town Project maintains that Lawyers Title cannot use an agency theory–that Strathmore or Terra's actual knowledge can constitute Lower Town Project's actual knowledge–to not provide coverage under the Policy.

Lower Town Project states that Lawyers Title bases its agency theory on the property agreement between Strathmore and Lower Town, LLC.  (*Id.* at 10-11.)  The knowledge requirement, Lower Town Project argues, would have to be imputed from Strathmore to Lower Town, LLC to Lower Town Project, what Lower Town Project calls a "double imputation" and states is impermissible under the endorsement policy.  (*Id.* at 11.)

Lower Town Project next argues that since Strathmore is the manager of Lower Town Development and the endorsement prohibits Lawyers Title from imputing the knowledge

27

of Lower Town Development to Lower Town Project, that Lower Town Project could not have the requisite knowledge to be liable. (*Id.*)  Lower Town Project then states that Strathmore executed the property management agreement twice, first as Lower Town, LLC's manager, and then as the property manager.  Lower Town Project alleges that the endorsement prohibits the imputation of knowledge from Strathmore to Lower Town Project.  (*Id.*)

Lower Town Project also argues that Strathmore cannot be an agent of Lower Town, LLC because the Strathmore-Lower Town, LLC agreement expressly states that Strathmore was an independent contractor and not an agent of Lower Town, LLC.  *Id.*  But Lower Town Project is incorrect.  "As a matter of legal custom and tradition, moreover, nothing about the title independent contractor invariably precludes someone from being an agent under appropriate circumstances."  *U.S. v. Hudson*, 491 F.3d 590, 595 (6th Cir. 2007) (quoting "[a]n independent contractor . . . may or may not be an agent;" and "a person may be both an independent contractor and an agent.") (citations omitted).  See also *Hill v. Sears Roebuck & Co.*, No. 295071, 2011 WL 2023012, at *4 (Mich.Ct.App. May 24, 2011) (quoting, "the existence and scope of an agency relationship are questions of fact for the jury" and stating that "while [a contractor stating that a party is an independent contractor] favors a finding of an independent contractor relationship, it does not definitively settle the issue.") (citation omitted).

28

The Court has already addressed Lower Town Project's arguments above.  But the Court further stresses that Lawyers Title has made a sufficient showing that the lines distinguishing the entities have been blurred by the entities themselves.[7]

### 2.  Known loss and equitable estoppel

Lawyers Title also argues that the known loss doctrine should prevent Lower Town Project from receiving the Policy's benefits and that Lower Town Project is equitably estopped from receiving the Policy's benefits.

### a.  Known loss

"The known loss doctrine is a common law concept that derives from the fundamental requirement of fortuity in insurance law.  Its basic premise is that insurance policies are intended to protect insureds against risks of loss; not losses that have already taken place or are substantially certain to occur.  Accordingly, the doctrine is properly invoked when the insured 'knows' about the claimed loss before the policy is purchased."  *Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 10 F.Supp.2d 771, 789 (E.D.Mich. 1998) (Edmunds, J.) (citations and quotation marks omitted).

---

[7]Lawless's testimony further supports Chappelle's involvement in Broadway Village. Lawless:  Scott asked us to execute a document that changed the name for what the owner of [Broadway Village] would be.
Q:      Did you understand that [Chappelle or Chappelle's] entity . . . [Chappelle] directly or indirectly, would continue to be an owner of the project?
A:      He would still be the controlling person of the project.
Q:      And throughout this time, meaning before [the assignment was executed and after it was executed], for you Scott Chappelle was the owner; would that be fair to say?
A:      Yes.
Q:      And that never changed?
A:      Never changed.
(Lawless Dep. at 27.)

Courts have held that the known loss doctrine must be "judged using a subjective standard" because requiring this "knowledge element best serves the overall principle of insurance." *Id.* (citation omitted). The crucial analysis, then, is whether the insured "was aware, at a minimum, of an immediate threat of [the risk of loss] for which it was ultimately held responsible and for which it now seeks coverage." *Id.*

Here, because there is an issue whether Chappelle, his entities, and Lower Town Project actually knew about the Clark, Conestoga, and H&M liens against Broadway Village, the Court finds that the known loss doctrine is a viable defense to Lower Town Project's claim and will allow it survive.

### b. Equitable estoppel

"The principle of estoppel is an equitable defense that prevents one party to a contract from enforcing a specific provision contained in the contract." *City of Grosse Pointe Park v. Michigan Mun. Liab. and Prop. Pool*, 702 N.W.2d 106, 116 (Mich. 2005). "Equitable estoppel may arise where (1) a party, by representations, admissions, or silence intentionally or negligently induces another party to believe facts, (2) the other party justifiably relies and acts on that belief, and (3) the other party is prejudiced if the first party is allowed to deny the existence of those facts." *Conagra, Inc. v. Farmers State Bank*, 602 N.W.2d 390, 405 (Mich.Ct.App. 1999) (citation omitted). "Silence or inaction may form the basis for an equitable estoppel only where the silent party had a duty or obligation to speak or take action." *Id.* at 405-06.

30

The Court will allow this defense to survive past summary judgment, based upon the reliance discussion below–there is a sufficient indication that Lawyers Title would not have issued the Policy had it not received the affidavit.

### 3. Timeliness

Both Lawyers Title and Lower Town Project argue that the other did not timely act as required by the Policy.

Lawyers Title argues that the Policy required Lower Town Project to "promptly" notify it in writing if any litigation arose that might cause Lawyers Title to be liable under the Policy. Lawyers Title alleges that Lower Town Project did not promptly notify it in writing, and that Lower Town Project instead waited nine months before it contacted Lawyers Title. (Def.'s Mot. for Summ. J. at 23-24.) Lawyers Title asserts that in this nine month period, discovery closed, dispositive motions were pending, and settlement discussions were taking place. (*Id.*)

Lower Town Project argues that it contacted Lawyers Title about the litigation on July 30, 2009, after Lower Town Project "obtained discovery and determined that" the liens should have been covered by the Policy. (Pl.'s Mot. for Summ. J. at 15.) Lower Town Project maintains that Lawyers Title had three and one-half months to investigate the litigation/claims before Lower Town Project settled; and that amount of time is not an "unreasonable" amount of time "to expect [Lawyers Title] to make at least a decision on whether to defend the claim." (*Id.* at 16.)

The policy provides:

31

3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT

The Insured shall notify the Company promptly in writing (I) in case of any litigation as set forth in Section 5(a) of these Conditions, (ii) in case Knowledge shall come to an Insured hereunder of any claim of title or interest that is adverse to the Title, as insured, and that might cause loss or damage for which the [Transnation] may be liable by virtue of this policy, or (iii) if the Title, as insured, is rejected as Unmarketable Title. If [Transnation] is prejudiced by the failure of the Insured Claimant under the policy shall be reduced to the extent of the prejudice.

5.  DEFENSE AND PROSECUTION OF ACTIONS

(a) Upon written request by the Insured, and subject to the options contained in Section 7 of these Conditions, [Transnation,] at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim  covered by this policy adverse to the Insured.  This obligation is limited to only those stated causes of action alleging matters insured against by this policy.  The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the Insured as to those stated causes of action.  It shall not be liable for and will not pay the fees of any other counsel.  [Transnation] will not pay any fees, costs, or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.

(b)  [Transnation] shall have the right, in addition to the options contained in Section 7 of these Conditions, at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the Title, as insured, or to prevent or reduce loss or damage to the insured.   [Transnation] may take any appropriate action under the terms of this policy, whether or not it shall be liable to the Insured.  The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy.  If [Transnation] exercises its rights under this section, it must do so diligently.

(c)   Whenever [Transnation] brings an action or asserts a defense as required or permitted by this policy, [Transnation] may pursue the litigation to a final determination by a court of competent jurisdiction, and it expressly reserves the right, in its sole discretion, to appeal any adverse judgment or order.

9.  LIMITATION OF LIABILITY

    (c)  [Transnation] shall not be liable for loss or damage to the Insured for liability voluntarily assumed by the insured in settling any claim or suit without the prior written consent of [Transnation.]

(Compl., Ex. A, The Policy.)

"The purpose of provisions in insurance contracts requiring the insured to give the insurer prompt notice of accident or suit is to allow the insurer to make a timely investigation of the accident in order to evaluate claims and to defend against fraudulent, invalid or excessive claims." *Kermans v. Pendleton*, 233 N.W.2d 658, 661 (Mich.Ct.App. 1975) (citations omitted).  "Mere delay in giving the required notice does not result in a forfeiture since such provisions have been interpreted to require notice within a reasonable time." *Id.* (citations omitted).  "Prejudice to the insurer is a material element to be considered in determining whether notice is reasonably given." *Id.* (citations omitted.) "[T]he insurer has the burden to demonstrate such prejudice." *Id.* (citations omitted).  "The question of whether the notice was reasonably given is a question for the factfinder. *State Farm Fire & Cas. v. Wylie*, No. 189703, 1997 WL 33345899, at *2 (Mich.Ct.App. 1997) (citations omitted).  "However, where the facts are undisputed and only one conclusion is reasonably possible, the issue of prejudice is one of law." *Id.* (citation omitted).

Prejudice "will be found to exist where the delay 'materially' impairs an insurer's ability to contest its liability to [] an insured or third party." *ABO Petroleum, Inc. v. Colony Ins. Co.*, No. 04-72090, 2005 WL 1050220, at *13 (E.D.Mich. Apr. 19, 2005) (Cleland, J.) (citation omitted).  "In determining whether an insurer's position has actually been prejudiced by the insured's untimely notice, courts consider whether the delay has materially impaired the insurer's ability: (1) to investigate liability and damage issues so as to protect its interests;

33

(2) to evaluate, negotiate, defend, or settle a claim or suit; (3) to pursue claims against third parties; (4) to contest the liability of the insured to a third party; and ([5]) to contest its liability to its insured." *Id.* (citation omitted). "Michigan courts generally leave the question of prejudice to the trier of fact, but where the facts permit only one reasonable conclusion[,] the question is one of law." *Id.* (citation omitted).

Here, although Lower Town Project may have waited nine months to inform Lawyers Title of its claim, Lawyers Title has not shown that it was materially prejudiced by the delay. Lawyers Title informed Lower Town Project that it may take up to six months to investigate the claim; here, Lawyers Title had three and a half months before Lower Town Project settled the prior litigation. Lawyers Title has not offered any reason why it could not have finished its investigation or participated in the settlement agreements in that amount of time. The Court therefore does not find, as a matter of law, that either party is entitled to summary judgment based upon the Policy's time requirements.

### B. Lawyers Title's misrepresentation claims against Chappelle, Strathmore, Lower Town Development, Terra, and Clark

#### 1. Misrepresentation

Lawyers Title alleges misrepresentation claims against the third-party defendants. Against them, then, Lawyers Title has to prove that: (1) the third-party defendant made a material misrepresentation, (2) that was false; (3) that when it made the misrepresentation it knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that it made it with the intention that it should be acted upon by Lawyers Title; (5) that Lawyers Title acted in reliance upon it; and (6) that Lawyers Title

34

thereby suffered injury. *Hi-Way Motor Co. v. Int'l Harvester Co.*, 247 N.W.2d 813, 816 (Mich. 1976) (quoting *Chandler v. Heigho*, 175 N.W. 141, 143 (Mich. 1919)). "[T]he absence of any one of [these elements] is fatal to a recovery." *Id.*

### 2. Third-party misrepresentation

Here, Lawyers Title has alleged third-party fraud against the third-party defendants. Lawyers Title therefore has to show that, although the third-party defendants did not directly make a misrepresentation to Lawyers Title, they did make a misrepresentation on which they knew a third party was going to rely.

> While some connection, direct or indirect, between a party charged with making false representations and a party relying thereon must be shown, it is not essential, in support of a cause of action for damages resulting from false representations, that the false representations be shown to have been made directly to the party claiming to have relied upon them. It has been repeatedly held that where a party makes false representations to another with the intent or knowledge that they be exhibited or repeated to a third party for the purpose of deceiving him, the third party, if so deceived to his injury, can maintain an action in tort against the party making the false statements for the damages resulting from the fraud.

*Oppenhuizen v. Wennersten*, 139 N.W.2d 765, 768 (Mich.Ct.App. 1966) (emphasis removed). "Where the defendant has not made the representation directly to the plaintiff, the injury suffered by the plaintiff must be directly traceable to the defendant's misrepresentation." *Martell v. Turcheck*, No. 07-14068, 2008 WL 2714210, at *4 (E.D.Mich. July 7, 2008) (Edmunds, J.) (emphasis removed) (citations omitted).[8]

_____

[8]Lawyers Title suggests that *Williams v. Polgar*, 215 N.W.2d 149 (Mich. 1974) stands for the proposition that it can hold Clark liable because "a representation need not be made directly to the party injured by it to be actionable; it is enough that the injured party be a member of a class of persons who might foreseeably rely on representation." The *Polgar* court held that "this [negligent misrepresentation] arising from breach of the abstracter's

35

*Oppenhuizen* illustrates the type of misrepresentation and connection needed for third-party fraud. There, Oppenhuizen purchased a car from Wennersten. 139 N.W.2d at 767. Wennersten had previously purchased the car from Veneklasen, who sold the car, knowing that it was a stolen vehicle, and did not reveal the car's stolen character to Wennersten. *Id.*

The court held that "Veneklasen set the whole sequence of events in operation." *Id.* The court further reasoned that "it was foreseeable that someone beyond Wennersten would be hurt if the true facts were discovered concerning [the car.]" *Id.*

On appeal, Veneklasen argued that the plaintiff could not sustain a fraud action against him because he did not make a representation to the plaintiff. *Id.* at 768. The court disagreed. The court held that "defendant Veneklasen knew that the forged title would be used by Wennersten in [reselling the car] and that his sale was based mainly upon such an event happening." *Id.* at 769. The court then reasoned that Veneklasen could not have

---

contractual duty runs to those persons an abstracter could reasonably foresee as relying on the accuracy of the abstract put into motion. The particular expert-client relationship accruing to a professional contract to certify the condition of the record of title reposes a peculiar trust in an abstracter which runs not only to the original contracting party. There is a clearly foreseeable class of potential injured persons which would obviously include grantees where his or her grantor or any predecessor in title of the grantor has initiated the contract for abstracting services with the abstracter." *Polgar*, 215 N.W.2d at 157. Neither party has brought a case applying the *Polgar* foreseeability analysis in an intentional misrepresentation context and the Court has not found one on its own. *Polgar* therefore does not apply to this case. Lawyers Title has not pleaded a negligent misrepresentation claim, and therefore it must attempt to withstand summary judgment on its intentional misrepresentation claim. *See Tucker v. Union of Needletraders, Indus., and Textile Emp.*, 407 F.3d 784, 788 (6th Cir. 2005) (citing authority and quoting, "[a] non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion. At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Rule 15(a).")

intended that Wennersten would not have represented a valid title to a prospective purchaser. *Id.* And the court therefore stated that "[s]uch a conclusion validates the connection or relationship between the parties necessary to hold [Veneklasen] responsible to plaintiff for his damages suffered by reason of the fraud." *Id.*

### a. Misrepresentation based upon the affidavit

Chappelle, Strathmore, and Lower Town Development have moved for summary judgment on Lawyers Title's misrepresentation claims against them based upon the affidavit.[9] Chappelle, Strathmore, and Lower Town Development argue that "[Lawyers Title] has produced no more than conclusory allegations to supports its claim for intentional misrepresentation," and therefore requests that the Court deny Lawyers Title's motion for summary judgment. (Chappelle Mot. for Summ. J. at 11.) Lawyers Title's argument tracks *Oppenhuizen*. It argues that Chappelle, Strathmore, and Lower Town Development made material misrepresentations in the November 14, 2007 affidavit–that no liens or encumbrances existed on Broadway Village at the time of the property's transfer to Lower Town Project. (Third-Party Compl. ¶ 32.) Lawyers Title then argues that Chappelle, Strathmore, and Lower Town Development intended that third-parties such as Lawyers

---

[9]Chappelle, Strathmore, and Lower Town Development argue Lawyers Title is precluded from filing suit against Chappelle and Strathmore based upon certain language in the affidavit. The affidavit contains the following clause: "In the event that any of the representations made herein prove to be incorrect, for any reason, and a claim is made by **a third party** with respect to these matters, Affiant agrees to indemnify and hold harmless Transnation Title Insurance Company from all claims and damages, including litigation costs and attorney fees arising as the result of such claim." (Emphasis added.) (Chappelle's Mot. for Summ. J., Ex. 5, Affidavit.) Lower Town Development is the Affiant. (*Id.*) But here, the claim is by Lawyers Title/Transnation against Chappelle, Strathmore, and Lower Town Development. The claim is not by a third party, it is by a party to the affidavit. The Court therefore finds that this language does not preclude Lawyers Title's suit.

Title would rely on this affidavit and that it relied on it, and possibly, depending upon Lower Town Project's claim against Lawyers Title, to its injury.

The Court agrees with Lawyers Title. Lawyers Title has created an issue of material fact whether a misrepresentation was made, it has shown that it relied on the alleged misrepresentation, and it has alleged an injury: Lower Town Project's claim against it.

Chappelle, Strathmore, and Lower Town Development argue that Lawyers Title cannot show that it relied upon the affidavit in issuing its policy. But in Michigan, in an insurance contract context, an insurance company can prove a material misrepresentation and reliance upon that misrepresentation if "the misrepresentation affects the insurer's risk or relates to the insurer's underwriting guidelines." *Kitterman v. Mich. Educ. Emp. Mut. Ins.*, 247428, 2004 WL 1459523, at *3 (Mich.Ct.App. June 29, 2004) (citing *Katinsky v. Auto Club Ins. Ass'n*, 505 N.W.2d 895, 896 (Mich.Ct.App. 1993).[10]

Here, then, Lawyers Title has made a sufficient showing to withstand Chappelle, Strathmore, and Lower Town Development's motion for summary judgment. As shown above, Lawyers Title has created an issue of fact about a misrepresentation–with

---

[10]See *Lash v. Allstate Ins. Co.*, 532 N.W.2d 869, 872 (Mich.Ct.App. 1995) (finding, in the car insurance context, that rescission is justified in cases of innocent misrepresentation, because the insurance company "would not have issued the policy had it known about [the] plaintiff's [violation] because [the] plaintiff would have been ineligible under its guidelines." And further finding: "[The] [p]laintiff should not be unjustly enriched at [the insurance company's] expense because of his misrepresentation, even accepting that it was innocent.") See also *Tudor Ins. Co. v. Associated Land Title, LLC*, 08-11831, 2010 WL 716309, at *4 (E.D.Mich. Feb. 23, 2010) (Duggan, J.) (citing *Lake States Ins. Co. v. Wilson*, 586 N.W.2d 113, 115 (Mich. 1998) (stating, "[the insurance company] must establish that the [insured] made a 'material misrepresentation in its application for insurance[,]" and "[a] material misrepresentation is one that is relied on by the insurance company in the sense that it 'related to the insurer's guidelines for determining eligibility for coverage.'"). *Id.*

Chappelle and Lawless's conflicting statements, that show that there is a dispute that Clark was still owed money at the time of Broadway Village's transfer.  Lawyers Title has also made a sufficient showing of reliance–for the affidavit/alleged misrepresentation "affects the insurer's risk or relates to the insurer's underwriting guidelines."  (*Id.*)  Lawyers Title would not have issued the title insurance had it known that Clark and the other companies were going to file liens on Broadway Village.

These facts, then, track *Oppenhuizen*.  Chappelle, Strathmore, and Lower Town Development, like Veneklasen, allegedly knew that money was owed to several companies for their work on Broadway Village.   Despite this alleged knowledge, Chappelle, Strathmore, and Lower Town Development executed the affidavit stating that there were no liens or encumbrances on Broadway Village's title.  As in *Oppenhuizen* with Veneklasen, Chappelle, Strathmore, and Lower Town Development made this representation to Lower Town Project.  Chappelle, Strathmore, and Lower Town Development, therefore, "set the whole sequence of events [relating to the lack of defects on Broadway Village's title] in operation," and "it was foreseeable that someone beyond [Lower Town Project] would be hurt if the true facts were discovered concerning [the title.]" *Oppenhuizen*, 139 N.W.2d at 767.

Lawyers Title therefore has created a genuine issue of material fact as to its misrepresentation claims against Chappelle, Strathmore, and Lower Town Development.

The Court therefore denies Chappelle, Strathmore, and Lower Town Development's motion for summary judgment against Lawyers Title.[11]

### b. Misrepresentation based upon the Clark-Terra-Lower Town Project assignment

Lawyers Title alleges that Terra and Clark are liable for misrepresentation based upon the assignment they executed.  In the assignment, Clark represented that "there is no outstanding default under the [Terra-Clark contract] and that Clark's interest in the [Terra-Clark contract] is not subject to any claim, set-off, lien or encumbrance of any nature." (Clark's Mot. for Summ. J., Ex 1, Assignment.) As it turns out, Clark has stated that there was, in fact, money owed under the contract, and that Chappelle, and therefore Terra, knew about these claims.

### i.  Terra's argument

Terra has moved for summary judgment on the misrepresentation claim.  Terra argues that Lawyers Title cannot sustain a misrepresentation claim because Lawyers Title cannot show that Terra made any representation with the intent that Lawyers Title rely on the misrepresentation and that there is no evidence that Lawyers Title actually relied on any alleged misrepresentation.  (Chappelle Mot. for Summ. J. at 6.)  Terra argues that it never

---

[11]Although Lawyers Title has requested summary judgment against Chappelle, Strathmore, and Lower Town Development, because there are issues of fact about the misrepresentations, and Lawyers Title's misrepresentation claim is dependent upon the Lower Town Project-Lawyers Title claim, the Court also denies its motion.  The Court further notes, as Chappelle, Strathmore, and Lower Town Development point out in their brief, Lawyers Title does not do much to support its argument for its own motion. (Chappelle's Resp. to Lawyers Title's Mot. for Summ. J. at 2.)  But Lawyers Title has done enough to withstand summary judgment against it.

made any promises to Transnation in the assignment. (*Id.* at 8.)  The only representations made, Terra argues, were to Lower Town Project. (*Id.* at 9.)

### ii. Clark's argument

Clark argues that Lawyers Title has not and cannot satisfy the elements necessary to sustain a misrepresentation claim.  Clark argues that it did not make a representation to Lawyers Title and that Lawyers Title has not shown reliance upon Clark's contract with Lower Town Project.  Without these two elements, Clark maintains that Lawyers Title cannot sustain a misrepresentation against it.

### iii. There is sufficient evidence to let the misrepresentation claims to go forward

The Court disagrees with Terra and Clark's arguments.

Terra made a representation to Lower Town Project in the assignment.  Terra, through Chappelle as its president, represented and warranted that Terra's "interest under the [assignment] is not subject to any claim, setoff, lien or encumbrance of any nature[.]" (Clark's Mot. for Summ. J., Ex. 1, Assignment.)  Lawless, on behalf of Clark, made a similar representation that "there is no outstanding default under the [Terra-Clark contract] and that Clark's interest in the [Terra-Clark contract] is not subject to any claim, set-off, lien or encumbrance of any nature." (Clark's Mot. for Summ. J., Ex 1, Assignment.)  As it turned out, Clark has indicated that that statement may have been false:

> Q:  Now, at the time of the assignment . . . was Clark [] owed money for services that it provided?
> Lawless:  Yes.

41

(Lawless Dep. at 36.)  And, as discussed above, Clark had repeatedly called Chappelle about payment–there is evidence therefore that Terra knew the representation may have been false.

As to evidence that someone would rely on the representations, that evidence also exists.

> Q:  Did Clark understand that people would rely upon the representations and warrant[ies] made within that assignment?
> Lawless:  I didn't consider that at that time.  I signed it on my behalf.  On the company['s] behalf.

(Lawless Dep. at 32.)

> Q:  Would it be fair to say that in 2007, you knew that when somebody represents and warrants something, that that's for the purpose of someone else relying upon it?
> ***
> Lawless:  Yes.

(*Id.* at 33-34.)  Lawless clarified, stating that he "figured [Chappelle] would rely on [the assignment]" because "[t]hat's who [he] was dealing with."  (*Id.* at 34.)  And finally, Lawless was questioned:

> Q:  Was it your understanding and intention, at the time of this assignment, that whatever the new ownership entity of this project was, that they would be bound by your original contract for the project?
> A:  Yes.
> Q:  Was it your understanding and intention that whoever it was that was now going to own the project, that would –would succeed all the obligations under that contract?
> A:  Yes
> Q:  And all the rights under that contract?
> A:  Yes.

(*Id.*)

The Court recognizes that Lawyers Title's misrepresentation claim based upon the assignment is less strong than its claim based upon the affidavit, but the Court still must let the claim go forward and deny the motions for summary judgment. Here, Lawyers Title relied on the statement that there were no defects on Broadway Village's title. That statement turned out to be false when Clark and the other companies filed liens on the property.

Following *Oppenhuizen* then, there is enough evidence to allow these claims to go forward. There is evidence that both Terra and Clark made a false statement about amounts owing under their contract. As to Clark, Lawless has stated that he knew some other party, including Chappelle, would rely on that representation. As to Terra, because Chappelle signed as president of Terra, and then he also executed the affidavit to Lawyers Title, there is a significant indication that Terra knew that a third party would rely on the representation in the assignment.

The Court concludes then that these claims must proceed to trial. Lawyers Title has brought forth sufficient evidence that, if it is found liable to Lower Town Project, it may have actionable misrepresentation claims against the third-party defendants.

### d. Fred Perlini's testimony

The third-party defendants all rely on Fred Perlini, Lawyers Title's Rule 30(b)(6) deposition witness, to support their claim that they are entitled to summary judgment on Lawyers Title's misrepresentation claims. Perlini's testimony, they argue, conclusively shows that Lawyers Title did not rely on the assignment or affidavit. The Court disagrees

43

with the third-party defendants. Although Perlini's testimony appears to support the third-party defendants' arguments, here, the assignment and affidavit themselves show that there are material issues as to the misrepresentation and reliance thereon.

Perlini states that he reviewed some documentation about this case, but that he was not familiar with the transaction.  (Chappelle's Mot. for Summ, J., Ex. C, Perlini Dep. at 8.) He was and is not an employee of Transnation or Lawyers Title.[12]  (*Id.* at 9-10.)  The Court highlights the testimony on which Clark relies:

> Q:  Do you have any knowledge of any reliance by Transnation on any representation by [Clark?]
> A: Firsthand personal knowledge?
> Q: Yes.
> A:  No, sir, I don't.

(*Id.* at 13.)

> Q:  Do you have any knowledge of what representation was made by Clark?
> A:  I believe that there was a document that I had seen, and forgive me, I don't know the exact title of it, but I believe it was with regards to an assignment of a contract where a couple of parties had made representations that at the time the document was being or the contract was being assigned, that there were no defaults or outstanding matters under the contract, or something to that effect.

---

[12]Perlini states that he works for Chicago Title of Michigan and that Chicago Title is a sister company of Lawyers Title.  (Perlini Dep. at 10.)  The Court is at an utter loss why Lawyers Title offered Mr. Perlini to testify, save for the following explanation:

Q:  Can you tell us why you were selected to represent Lawyers Title at this deposition?
A:  I honestly don't know other than the fact that I don't believe anybody from Transnation was available.

(Perlini Dep. at 32.)

44

(*Id.* at 13-14.)

> Q:  Is it fair to say, then, that you don't know whether the representations were true or false?
>
> A:  That would be accurate, yes.

(*Id.* at 14.)

Talking about the assignment of the Clark-Terra contract to Lower Town Project:

> Q:   All right.   Do you know if anybody at Transnation ever saw this document?
>
> A:  I have no idea.
>
> Q:  And it's fair to say if you look at the assignment, Transnation's not mentioned in it, is it?
>
> A:  Did not recall seeing their name anywhere.  No, their name does not appear in the document.

(*Id.* at 16.)

> Q: So then it's fair to say that you don't know if Transnation ever relied upon the assignment that's attached to the third-party complaint?
>
> A:  I would not be able to make that representation.

(*Id.* at 17.)

> Q:  Do you know if anybody at Transnation ever saw the Clark [] contract at the time of the transaction or before?
>
> A:  I honestly don't know.

(*Id.* at 30.)

Lawyers Title has also asserted a misrepresentation claim against Chappelle, Strathmore, Lower Town Development, and Terra.  Their counsel questioned Perlini about the same issues as Clark's counsel did:

> Q:  Do you have any personal knowledge of how the representations were false?
>
> A:  No, sir, I don't.

(*Id.* at 39.)

> Q:  Do you know anyone at Lawyers Title who might have knowledge of how the representations were false?
>
> A:  No, sir, I don't.
>
> Q:  Do you have any personal knowledge that Terra knew [the] representations were false?
>
> A:  No, sir, I do not.
>
> Q:  Do you have any personal knowledge that Terra made the representations recklessly?
>
> A:  I do not.
>
> Q:  Do you know if the representations were made to Transnation?
>
> A:  And we're again, referring back to the assignment of contract.  I don't know that, no.

(*Id.* at 40.)  See also *id.* at 41-43 for a similar colloquy with Perlini relating to the Chappelle, Strathmore, and Lower Town Development claims.

Despite Perlini's testimony, the Court finds that the testimony does not destroy Lawyers Title's misrepresentation claims.  As stated above, there is sufficient evidence, with the relevant documents and testimony, to allow these claims to proceed to trial.

## C.   Lawyers Title indemnification claims against Clark, Chappelle, Strathmore, Lower Town Development, and Terra

The Court must reserve a finding on Lawyers Title's indemnification claims; these claims are dependent upon factual findings relating to the cross-motions for summary judgment concerning the Policy.

46

"The right to common-law indemnification is based on the equitable theory that where the wrongful act of one party results in another party's being held liable, the latter party is entitled to restitution for any losses. The right exists independently of statute, and whether or not contractual relations exi[s]t between the parties and whether or not the negligent person owed the other a special or particular legal duty not to be negligent. Common-law indemnity is intended only to make whole again a party held vicariously liable to another through no fault of his own. This has been referred to as 'passive' rather than 'causal' or 'active' negligence. It has long been held in Michigan that the party seeking indemnity must plead and prove freedom from personal fault. This has been frequently interpreted to mean that the party seeking indemnity must be free from active or causal negligence. Therefore, a common-law indemnification action cannot lie where the plaintiff was even .01 percent actively at fault." *Botsford Continuing Care Corp. v. Intelistaf Healthcare, Inc.*, No. 294780, —N.W.2d—, 2011 WL 1002872 (Mich.Ct.App. Mar. 22, 2011) (quotations marks, citations, and alterations omitted).

"In general, whether a party is 'passively' (vicariously) liable or 'actively' liable for purposes of determining the availability of common-law indemnity is to be determined from the primary plaintiff's complaint. If the primary plaintiff's complaint contained any allegations of active negligence, rather than merely allegations of passive negligence, common-law indemnification is not available." *Id.* (quotation marks, citations, and alterations omitted).

"It has long been held in Michigan that the party seeking indemnity must plead and prove freedom from personal fault. This has been frequently interpreted to mean that the

47

party seeking indemnity must be free from active or causal negligence.  If a party breaches a direct duty owed to another and this breach is the proximate cause of the other party's injury, that is active negligence.  Where the active negligence is attributable solely to another and the liability arises by operation of law, that is passive negligence." *Feaster v. Hous*, 359 N.W.2d 219, 222 (Mich.Ct.App. 1984) (quotation marks and citations omitted).

"To determine whether the indemnitee was actively or passively negligent, the court examines the primary plaintiff's complaint. If the complaint alleges active negligence, as opposed to derivative liability, the defendant is not entitled to common-law indemnity." *Id.* (quotation marks, citations, and alterations omitted).

Here, looking at Lower Town Project's complaint, the Court cannot say that Lawyers Title is with or without fault.  Lower Town Project has alleged that Lawyers Title did not participate in the state court controversy.  And there are issues of fact whether Lawyers Title should have.  If Lawyers Title should have participated in the settlement negotiations and did not, the Court cannot say that Lawyers Title was not, at least in part, at fault.  The Court must therefore reserve the resolution of this claim.

## IV.  Conclusion

For the above stated reasons, the Court DENIES Lower Town Project's motion for summary judgment as to liability against Lawyers Title; DENIES Lawyers Title's motion for summary judgment against Lower Town Project; DENIES Lawyers Title's motion for summary judgment against Chappelle, Strathmore, Lower Town Development, and Terra; DENIES Chappelle, Strathmore, Lower Town Development, and Terra's motion for summary judgment on Lawyers Title's misrepresentation claims; DENIES Clark's motion

for summary judgment on Lawyers Title's misrepresentation claims; and DENIES AS

PREMATURE Lawyers Title's indemnification claims against Chappelle, Strathmore, Lower

Town Development, Terra, and Clark.

      SO ORDERED.

                              s/Nancy G. Edmunds
                              Nancy G. Edmunds
                              United States District Judge

Dated:  August 1, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 1, 2011, by electronic and/or ordinary mail.

                              s/Carol A. Hemeyer
                              Case Manager